FILED
March 13, 2015
Third Court of Appeals
Jeffrey D. Kyle
Clerk

03-14-00621-CV

COURT OF APPEALS

THIRD DISTRICT

AUSTIN, TEXAS

---

FRANK SELIGER:   APPELLANT

---

THE ETHIOPIAN EVANGELICAL CHURCH:   APPELLEE

An appeal from the County Court, at law number 2

Austin, Texas

**BRIEF FOR THE APPELLANT**

Frank Seliger

2108 East Yager Ln.

Austin, Texas 78754

(512) 619-3493

Representing himself:  pro se

# IDENTITY OF PARTIES AND COUNSEL:

**Appellant/Plaintiff**

RECEIVED
MAR 13 2015
THIRD COURT OF APPEALS
JEFFREY D. KYLE

Frank Seliger

2108 East Yager Ln.

Austin, Texas 78754

**Counsel for the Appellant:**

Frank Seliger

Representing himself /pro se

**Appellees/Defendant**

The Ethiopian Evangelical Church

**Counsel for the Appellee:**

James Minerve

Minerve Law Firm, Attorney

115 Saddle Blanket Trail

Buda, Texas 78610

# Table of Contents

                                                                             **Page**

IDENTITY OF PARTIES AND COUNSEL.................................................. i

INDEX OF AUTHORITIES................................................................ii

STATEMENT OF THE CASE...........................................................iii

1.) A short statement regarding the fact that I am representing myself -- pro se-- and I am seeking the Court of Appeals' patience and understanding.

2.) A request: The opposition may try to confuse this appeal by bringing up the details of the case... unrelated to the improper actions and or errors of the Judge. If they bring up topic related to "Parol Evidence" or the issue of "Clarity " in the contract – it is an attempt to drag the Appeals Court into the minutia of the overall case-- and a host of false assertions.

ISSUES PRESENTED...................................................................iv

1.) Did the County Court Judge err--- by inventing imposing an improper trial structure; **designed to exclude pertinent evidence, to limit or entirely stop legal arguments and objections** from the Plaintiff, Frank Seliger. If so... what was this structure... and how was it applied?

2.) Was there a **SPECIFIC document** that Frank Seliger tried to submit to the court... and was that document improperly excluded by the Judge.

3.) Why was that document critical to Frank Seliger's case?

4.) Did the County Court Judge **explain or justify the exclusion** of the critical document (to the jury and the other participants in the trial). Was that explanation in accordance with the Texas Rules of Civil Procedure ?

STATEMENT OF FACTS...............................................................1

1.) What does the Texas Rules of Evidence say-- with regard to what evidence is "proper"; and therefore should not be excluded from the evidence that the jury may consider?

2.) Did the specific evidence that was excluded by the Judge in the trail... qualify as proper evidence—according to the Texas Rules of Evidence?

SUMMARY OF ARGUMENT...........................................................2

STANDARD OF REVIEW.............................................................3

ARGUMENT..................................................................................4

CONCLUSION (relief sought)............................................................ 5

APPENDIX..................................................................................6

CERTIFICATE OF SERVICE.............................................................7

INDEX OF AUTHORITIES

STATEMENT OF THE CASE

1.) The Plaintiff wishes the court to understand that he is representing himself to the court in this Appeal as pro-se; Please excuse any errors I might make in this document... I will do my best to abide by the court's legal expectations as I understand them.

2.) I sincerely respect for the Court's mandate... to limit its inquiry to evaluating accusations of Judicial impropriety and error... I will refrain from discussing the minutia and the very divergent legal arguments involved in this case. However, I am very concerned that my legal opponent (the Appellee's attorney) will not refrain from doing this.

3.) **An overview of the case:** This is a contractual dispute between two parties. The contract is a lease agreement... that both parties negotiated and signed. I (the Defendant in that case) was the Leasee --and the Ethiopian Evangelical Church was the Plaintiff in that case... represented by their legal representative. The negotiator and the writer of the lease—was a woman named Lem Lem Berhane—who is part of the Church's administration. Lem Lem is not a native English speaker --and has no training in legal matters. Not being skilled in the language or the law...she lifted a leasing contract (almost verbatim from the web) from a web site called RocketLawyer.com. Lem Lem testified under oath that she faithfully put all of the

elements that both sides said they wanted (prior to the writing of the contract) into the contract. How she accomplished this – was the main subject of 6 hour trial.

But... Before the dispute became formal... Lem Lem wrote a letter (I will henceforth refer to it as "Lem Lem's Letter) to the Justice Court ... and in that letter, she made two statements that addressed critical topics that both parties agreed to (prior to the writing of the contract. These statements are central to the Appellant's legal argument in this dispute. That letter was entered into the court record when this dispute was in the Justice Court. That letter in the record-- followed the dispute as it made its way into the County Court.

During the trial in the County Court (that is the subject of this appeal-- when I tried to enter Lem Lem's letter into evidence... Mr. Minerve (The Appellee's new legal representative) strongly objected to the letter's introduction because it contradicts the false—but effective --legal strategy that he has devised. Judge Phillips excluded the letter. And the way he excluded it is so odd-- and divergent from standard judicial protocol—that it deserves judicial review in the Appeals process.

The judical exclusion of evidence... which was so obviously and legally appropriate -- forms the basis for this appeal.

## STATEMENT OF FACTS

The court should note that I have not described the points of contention in the disputed contract. That information is not relevant to this appeal. The foundation of this appeal is the exclusion of the letter that Lem Lem Burhane wrote. With that evidence, The Appellant would have been able to show the jury that the primary

witness and her lawyer were making false and misleading statements about the intent of both parties... when they entered into a contractual agreement two years earlier.

These are the relevant questions that the court should consider:

1.) How could Judge Phillips legally exclude evidence (Lem Lem's letter) from the Jury's consideration when that letter was written by a person (Lem Lem Berhane) authorized by the party (The Ethiopian Evangelical Church) to make a statement concerning the subject in the dispute?

2.) Lem Lem was tasked by the Church to write the disputed contract—and the excluded letter. She was "the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

3.) The details of the letter (not allowed into evidence) pertain directly to the case itself—and were critical to the Appellant... to counter the false version of the agreement that the opposition was presenting to the jury.

4.) It was a formal letter to the court. She knew that her statements would be considered by the court.

5.) The letter was already in the court record; but it was submitted in the "Justice court." The Justice Court Judge allowed that letter to be entered into evidence— and it is currently contained in the court record. The Justice Court record was transferred to the Civil Court when the case advanced to the County Court.

These are the legal reasons why it was improper for Retired Judge Phillips to suppress that evidence. The Jury should have been allowed to consider it.

In The Texas Rules of Civil Procedure—in the Texas Rules of Evidence—(Under section 801, Section (e))

"Statements that are not Hearsay. A statement is not hearsay if:

Section (2) Admission by Party-Opponent. The Statement is offered against a party and is:

A.) the party's own statement in either an individual or representative capacity;

B.) a statement of which the party has manifested in adoption or belief in its truth;

C.) a statement by a person authorized by the party to make a statement concerning the subject;

D.) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

## SUMMARY OF ARGUMENT

The Appeals court may want to know the specific legal reason that Judge Phillips gave for excluding Lem Lem's Letter. The answer is:

**<u>Judge Phillips gave no legal justification for suppressing that evidence.</u>**

If the Court will review the submitted excerpt from the Court Reporter's transcript...the court will see that the above answer is substantiated.

These are the circumstances that led up to the Judge's improper suppression of evidence:

The trail started with the Judge calling the first witness to testify. The witness Lem Lem Berhane is the representative of the Appellee... who is suing me. She can be described with complete accuracy as a "Hostile Witness" to me. She is suing me and wants to win this case. She is being coached by her lawyer to lie in court about the fundamental elements of our agreement... and she is yielding to his counsel.

When the trial started, Judge Phillips did not allow any opening statements. (This judicial structure was-- in itself, detrimental to my case and I believe it to be improper).

Because I was the Defendant... the Lawyer, Mr. Minerve was instructed by the Judge to call the first witness. Mr. Minerve call the witness that I had subpoenaed... Lem Lem Berhane. The Court should understand that Lem Lem Berhane hired Mr. Minerve to carry out this lawsuit against me. On that day in the County Court... They had a friendly, clear, well-rehearsed interrogation. When Mr. Minerve concluded... the Judge did not allow me to call my first witness. As person acting in my own defense... pro se... My preference for a first witness-- would have been myself. I have a right to act as witness and as legal representative. The Judge had allowed no opening statements. At that time... the Jury did not even know what the case was about and what the legal arguments were. But the Judge refused to let me testify. He insisted that Lem Lem Berhane remain on the witness stand. He demanded that I question her----or he would dismiss her from testifying altogether. This threat was improper, unfair and detrimental to my case. The jury (at the beginning of the trial) did not understand the case... and I had not been allowed to give them my side of the dispute. They would not, and could not understand the questions I was asking Lem Lem if they did not even know what the dispute was about. The opposition had done a very good job of feeding them a lot of false information.

I protested repeatedly... but the Judge was adamant. He imposed a structure upon me that I can only describe as... bizarre. I was instructed to present my side of the legal argument by asking short questions to a witness, Lem Lem.

The problem with that is ... Lem Lem wants me to lose this legal argument. She is completely hostile to my case... and is very reluctant to give clear or truthful answers—which might contradict the testimony she had given 3 minutes earlier).

The exchange between the Judge and myself is reflected in the Court Reporters transcript... (it begins on page 30) I am requesting that it will be reviewed by the Appeals Court.

Throughout the period that Lem Lem was on the witness stand, The Judge worked very hard to maintain the bizarre structure that I have described: (i.e. Insisting the Appellant question Lem Lem—before the Jury had heard his side of the legal dispute.)

There were four tools that he used to impose the structure.

1.) If I tried to explain something to the jury he repeatedly if I had a question for the witness.

2.) If I tried to explain something to the jury... he frequently ordered me to "stop testifying."

3.) If I tried to explain something to the jury... He frequently asked if the witness could "step down" and/or stated with great urgency and concern... that she needed to get back to work.

I was very desirous that the jury should understand my side of the legal argument... and the Judge was very desirous that they should not.

I think it would be helpful for the Court to hear a description of Judge Phillips' "non-sequitur" reasoning... because it illustrates his improper conduct and judicial error .

(This is recorded in the Court Reporter's transcript... Page 29... Line 7)

I continued to give the Judge reasons why I should be allowed to testify – before I questioned my subpoenaed witness. And the Judge continued to block that request... then...(think he realized that he did not have a strong enough justification...) because he very suddenly turned his attention away from me and turned to Lem Lem (on the witness stand).

He asked her the following questions:

Judge Phillips: Are you employed?

Lem Lem: Yes.

Judge Phillips: Do you have a job.

Lem Lem: Yes I do.

Judge Phillips: Where do you work?   (Starts on page 29... line 19 and goes through page 30)

From Lem Lem's answers, Judge Phillips made the following NON-SEQUETOR conclusion: Lem Lem works.   Lem Lem has a job.   Lem Lem's needs to get back to her job.   Nothing in this courtroom should delay Lem Lem from getting back to her job.

Once he had that conclusion firmly in hand-- he quickly turned his attention back to me.  In the next series of statements... He justified his insistence that I question the witness right now... (because she needed to get back to work) and he strongly implied that he would dismiss Lem Lem as a witness all together if I did not begin asking her questions... right now.

H made that implication -- crystal clear.

The above is a description of the Judge's "Improper judicial structure" and the way he imposed it—and the vailed threat that he used.

The other impropriety was the suppression of legitimate evidence.  As I stated earlier... **he did not give any legal reason for suppressing Lem Lem's Letter**.

This is an account of his actions (and the transcript will testify as to the accuracy of my description:   (Page 58... Line 10 through 18.)

Lem Lem was on the witness stand at the time.  I had just submitted the letter to be admitted as evidence).  Judge Phillips took a quick (5 second ) scan of the letter...

He then said, "It's just the same thing she has testified today. It is a waste of time. Let's move on to new questions."

When I objected … Judge Phillips said, "She has given her testimony. The jury heard it. What new questions do you have for her? She needs to go back to work. **She says she needs to go back to work."** .

The above statement shows that Judge Phillips' "false urgency" technique… eventually evolved into a full-blown falsehood. The truth is that Lem Lem never said that she "needed to go back to work." ! You will not find that anywhere in the transcript. In fact… Lem Lem never indicated if she even cared about going back to work. It is a safe assumption that most state workers (Lem Lem works for the State) don't go back to work if the court session lasts into the mid-afternoon. (Which this one did.) The transcript clearly shows that Judge Phillips invented and then used this fiction repeatedly…to justify his improper structure.

What the above quote illustrates something unusual… The Appellant has described two illustrations of "improper judicial conduct".

1.) The Judge suppressed legitimate evidence (Lem Lem's letter).
2.) He imposed an improper structure on the court…that was used to prevent the Appellant from presenting his side of the dispute to the jury.

I have included a section of the Court Reporter's transcript with this Appeal (with highlights and comments) to speed the Court's review process. I did not include the full testimony of the witness Lem Lem Berhane… because I am aware that the Court of Appeals has a huge work load…and it is the Appellant's responsibility to condense the scope of review to the parts of the trail that indicate --judicial error or impropriety.

# CONCLUSION

Because of judicial error and impropriety, I was blocked from providing critical information that (by every legal standard) ...should have been accepted as legitimate evidence in a trial. Without that letter... I was unable to demonstrate that there were contradictions between the witnesses stated testimony—and her written words. Her lawyers' emphatic and false assertions ... also could not be adequately disproven without that evidence.

As a consequence... the outcome of the trial was that Jury ruled for the Plaintiff... and against me.

# RELIEF SOUGHT

The Appellate Court should throw out the verdict that greatly harmed the Appellant in the County Court. I am entitled to get a fair trial... and that has yet to happen.

# AND FINALLY....

Judge Phillips was a great help to me in filing this Appeal. He could have worked against it... And if he had... it would not have happened. I told the Judge that I enjoyed my experience in his courtroom (despite the fact that I lost the case) because I got to see a brilliant old-school legal scholar – obviously, a dedicated pubic servant – exercise the power of the state. It was painful for me to lose... but it was fascinating. And I am confident that the Court of Appeals will assist me in making things right.

The unfortunate by-product of any effective appeal is a harsh (but accurate) criticism of a Judge's specific actions ... in a specific trial. Nothing more is asserted by the Appellant.

# APPENDIX:

Included with this Appeal are the following:

1. A copy of the relevant provisions of the "Texas Rules of Evidence"

2. A copy of the Court Reporter's record... (the section which is relevant to this Appellants Brief—and which substantiates judicial impropriety.)

3. Lem Lem's Letter to the Justice Court; The letter that Judge Phillips improperly excluded from the Juries consideration.

Most respectfully submitted:

**CERTIFICATE OF SERVICE**

A complete copy of this document was sent to the Defendant's attorney... by certified mail.

Frank Seliger   Pro se

 

(a) **Statement**. A "statement" is (1) an oral or written verbal expression or (2) nonverbal conduct of a person, if it is intended by the person as a substitute for verbal expression.

(b) **Declarant**. A "declarant" is a person who makes a statement.

(c) **Matter Asserted**. "Matter asserted" includes any matter explicitly asserted, and any matter implied by a statement, if the probative value of the statement as offered flows from declarant's belief as to the matter.

(d) **Hearsay**. "Hearsay" is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted.

(e) **Statements Which Are Not Hearsay**. A statement is not hearsay if:

(1) *Prior Statement by Witness*. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

(A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding except a grand jury proceeding in a criminal case, or in a deposition;

(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive;

(C) one of identification of a person made after perceiving the person; or

(D) taken and offered in a criminal case in accordance with Code of Criminal Procedure article 38.071.

(2) *Admission by Party-Opponent*. The statement is offered against a party and is:

(A) the party's own statement in either an individual or representative capacity;

(B) a statement of which the party has manifested an adoption or belief in its truth;

(C) a statement by a person authorized by the party to make a statement concerning the subject;

(D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship; or

(E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

(3) *Depositions*. In a civil case, it is a deposition taken in the same proceeding, as same proceeding is defined in Rule of Civil Procedure 207.* Unavailability of deponent is not a requirement for admissibility.

*[By Supreme Court Order, dated December 31, 1998, effective January 1, 1999, the reference to Rule 207 is changed to 203.6.]

[DRAFTERS' COMMENT TO RULE 801

The definitions in Rule 801(a), (b), (c) and (d) combined bring within the hearsay rule four categories of conduct. These are described and illustrated below.

**CROSS-EXAMINATION**

BY MR. SELIGER:

Q.    Do you want to be called Limlim?

A.    You can call me Limlim or Lemie.

Q.    It doesn't matter?

A.    It doesn't matter.

MR. SELIGER:  Okay.  Your Honor, I have a point of procedure I'd like to ask you.  And that is that can I wait ask and Limlim about all the things I want to ask her.  I actually paid for her to be a witness today.  I need to explain some things to the jury and actually testify myself.

THE COURT:  Well, I would prefer that we have a witness on the stand once because it's more economical about the witness' time.

MR. SELIGER:  Yes.  I just need to testify on my behalf first and then I will definitely ask her a lot of questions.

THE COURT:  Are you employed?

THE WITNESS:  Yes.

THE COURT:  Do you have a job?

THE WITNESS:  I do.

THE COURT:  Where do you work?

THE WITNESS:  I work for the State of Texas.

Note:
An argument is occuring between Frank Seliger and Judge Phillips.

Frank Seliger wishes to testify before a witness is cross examined

Why — because the Jury will not understand the witness testimony if they do not understand what the dispute is about.

Lemlem

Lem Lem

Lem lem

In this Section: Judge Phillips abruptly turns away from the argument and developes a rationalization to cut off all further debate. He does that right here.

THE COURT: For the State of Texas. The whole state? What department?

THE WITNESS: Department of Aging and Disability Services.

THE COURT: I'm sorry. I can't hear you. I'm getting old. Aging and Disability Services?

THE WITNESS: Yes. Under health and human service.

THE COURT: Okay. If you have questions for her, I would prefer that you ask them now so she can get on about her business.

MR. SELIGER: Okay. I need to outline some inconsistencies before I start questioning her because it's not going to work otherwise.

THE COURT: This witness is on the stand. She's your witness now to interrogate. Now is the time to do it.

MR. SELIGER: All right. Can I make a statement first before I interrogate her?

THE COURT: No. But you can ask her leading questions. You can bring it out by a leading question. Isn't it true that . improper Judicial structure is imposed

MR. SELIGER: Okay. I'll take your lead and I'll do that.

Q. (BY MR. SELIGER) Is Pastor Polis (ph) coming

back?

A.   He is outside.

Q.   He's outside?

A.   Yes.

Q.   Okay.  All right.  I am going to present a scenario to you of what I remember occurring and then intermittently I'm going to ask you if you agree that what I'm saying is true.

A.   Okay.

Q.   So I'm going to go through a history with you and then get your concurrence on this information.  Okay.

Before I do that, I just want to make one comment that I have to be very careful in not only the interview but I always have to be very careful when I'm addressing the Church Board of Elders.  I have to remember they are the Board of Elders.  They're respectable, wonderful people, but I'm accusing them of misstating information.  So it sounds very confrontive to do that to the Board of Elders and to -- also to, you know, imply what it implies that they're not being honest or they're not telling the whole truth.

And in this case that's the issue is that --

THE COURT:  Do you have any questions for

this witness or can she step down?

MR. SELIGER: I do.

THE COURT: Please ask them.

MR. SELIGER: Okay.

Q. (BY MR. SELIGER) So do you remember the first time that we met, which was to talk about possibly my renting the property from the church?

A. Yes.

Q. Okay. And that there was some agreement there that maybe you would consider doing that. And so we had a meeting, you and I and Pastor Polis, who was the pastor of the church at the time, and we met together at the old church on Capitol Street. And that's how I found you. And do you remember the circumstances of that --

MR. MINERVE: Objection, Your Honor. Relevance.

MR. SELIGER: It's very relevant. We're building a contract.

THE COURT: I'll overrule for now. We met, the three of us --

THE WITNESS: To sign the contract, we met at the church. So you came and signed the contract. That's what I do remember.

Q. (BY MR. SELIGER) We met there and we

discussed. And the circumstances were that you had this property and you were actively trying to sell it at the time. It was on Craigslist and I approached you because I found it on Craigslist and you were trying to sell it.

A. I put it on Craigslist to sell or rent. That was how it was posted actually, rent or sell. So not exactly actively but pass . . .

Q. You were trying to sell it and I approached you and said let me rent it from you instead. And so there was a discussion amongst the church. Did they want to let -- they weren't actively trying to rent the property?

MR. MINERVE: Your Honor, this is -- object to parole evidence.

THE COURT: I haven't heard anything yet that has anything to do with parole evidence.

MR. SELIGER: I'm just trying to get --

THE COURT: You had it posted for rent or for sale. He said he'd rent it. You had a meeting. He signed a contract.

THE WITNESS: Correct.

Q. (BY MR. SELIGER) We didn't sign a contract immediately because they had a demand. And the demand from me was they said we're actively trying to sell it. We might build on the property because we are outgrowing

our church and we need to move from our church.

THE COURT: Is that true?

THE WITNESS: What we discussed orally, I don't exactly remember, but we did -- I did post it for rent or sell. And I mentioned to you when we're ready to build, we might tell you to move out or if we decide to sell it and make more money to build another church, we might -- we have two options, but it's not for me to decide.

Q. (BY MR. SELIGER) We discussed both of those and we discussed that there were certain things the city might demand from you if you decided to build on the church -- on the property. The city was going to have to, you know, require all kinds of building codes and various other things. There's all kinds of things that were going to have to happen for that to happen or you might get a buyer.

A. Could be.

Q. You could get a buyer very quickly. I mean, you don't know because you're advertising it for sale also. So the demand for me from you, if you're going to lease this property, demand from me to the church was I have to agree to move. So I didn't have any guarantee. It would have -- I would have to move. And I had to agree to that. And I said, Wait. This is part of our

discussion. I said, the problem I have with that demand is that I have two thousand appliances, dishwashers, and refrigerators and that fits very nicely on a two-acre property. It's not a big deal if you have 200 appliances on a two-acre property.

THE COURT: Do you have any questions for this lady or can she step down?

MR. SELIGER: I do, sir.

THE COURT: Please ask.

MR. SELIGER: Okay.

Q. (BY MR. SELIGER) So I said, I need something from the church. I need three months' notification in order to move all that stuff if I had to move at any time. And you said, Okay. We'll give you the three-month notification.

THE COURT: Is that true?

THE WITNESS: We must have discussed about that and that's the reason that I was giving you a heads up.

Q. (BY MR. SELIGER) The heads up is the three-month notification. So the heads up, as she put the heads up, isn't a text.

THE COURT: This is speaking. You're giving speeches to the jury. This is the third time I've interrupted --

MR. SELIGER: Okay. I'm trying. I'm not used to this.

THE COURT: -- to tell you that this is the witness we want to hear from.

MR. SELIGER: Okay.

THE COURT: If you have questions for her, we'd love to hear her answers.

MR. SELIGER: All right, sir. I'm sorry. I'm not real good at this, but I'll work at it.

Q. (BY MR. SELIGER) Okay. So the point of this whole discussion that I'm trying to get at for the witness is that -- and I believe we've got agreement on this, Lemie, is that this discussion occurred. The church had a demand because they had pressures to move and to find a place to move to. They had not selected a church to move to. They might build on the property or they might sell the property. It was all in a flux at that time. You had a demand I needed to move at any time because, you know, anything could happen. And I had a demand that I need a three-month notification to move all my appliances. That's essentially what it was as far as our negotiation goes. Isn't that correct?

A. As I mentioned earlier, it's all on the contract. I -- you know, I wrote whatever we discussed on the contract. And the contract has proceedings from

what we said because I don't exactly remember the discussion at that time; however, I do remember trying to put all what you said on the paper.

Q.   Okay.  Now, you have testified, just now, essentially agreed to what I said, right.  But you have testified just now that you would put all that on paper and on the contract.  And that was the agreement after we said yes we agree to these terms that you would put this in the contract.  Is that your testimony?

A.   I said on the contract three months before we sell the property.  That's because you wanted three months.

Q.   Okay.  Now, you are testifying that you put our agreement into that -- into the contract?

A.   Say again.

Q.   It is your testimony today under oath that you went back -- actually, we left and another day we met.  This is just -- you recall, we said, Okay.  You have this condition.  I have this condition.  We'll put this in the contract.  You come back another day.  I think it was the day after.  And I'll have a contract drawn up for you and we can sign it.  And then we met the next day to sign the contract.  You had to write a contract.

A.   We were actually communicating on the phone especially with me.  And the very day I saw you is when

we signed the contract.

Q. Oh, okay. Okay. Then I have a miss memory, but we talked about it and then you drew up a contract --

A. Yes.

Q. -- that stated our two conditions?

A. Correct.

Q. Okay. All right. So it's your testimony that you put these conditions in the contract?

A. The conditions that we discussed are on the contract.

Q. Okay. What if I can show you that you didn't do that. What if I --

A. You should have told me then.

Q. I have to confront you, but you didn't do what you said you would do.

A. You should have told me then before you signed the contract. Before you sign the contract, you could have mentioned that.

Q. Okay. But if I didn't understand that -- you didn't at the time, but I can show you that. But anyway, I want to show you some evidence that I hope will prove that you didn't do what you said you would do. Okay. So let me do that real quick.

All right. So it's going to be up here on

this screen here. Now, I'm going to just talk about it. And let me look at that. And I want to try to get your agreement, just as Mr. Minerve tried to get your agreement, that this is this piece and that is that piece.

And you all have seen the evidence through Mr. Minerve's stuff. But it's very good to take a harder look at it.

THE COURT: What question do you have for this witness without making a speech to the jury between every question?

Q. (BY MR. SELIGER) Is this the lease agreement, the top part that says the term as you saw in Mr. Minerve's presentation? That's the top part of lease. Do you see the term? It says this lease will begin on July 1st, 2012, and will terminate on June 30, 2013.

A. Yes.

Q. That's a one-year term, right?

A. Yes.

Q. That was in the lease?

A. Yes.

Q. Pretty clear?

A. Yes.

Q. Okay. This is in the lease. I did this so the

jury could really focus in on this.

Now that says -- I'd read from it. Notwithstanding any provision of this agreement, landlord may terminate this agreement upon -- it says zero days, but it's actually three months' written notice to the tenant that the property has been sold.

THE COURT: This is not the copy of the lease?

MR. SELIGER: That is the copy.

THE COURT: Well, that's not the copy of the lease that's not in evidence.

MR. SELIGER: Yes, I didn't show a copy of the copy.

THE COURT: What does it say on the lease, on the -- whatever page that is?

THE WITNESS: Where did this come from?

Q. (BY MR. SELIGER) That came from rocketlawyer.com, which is what you lifted the lease from.

THE COURT: Let's deal with the lease that we all signed rather than --

THE WITNESS: Yeah.

THE COURT: -- an imaginary lease. What does the lease here say? Notwithstanding any other -- the caption is under -- it says 19. Termination upon

sale of the property.

MR. SELIGER: Yes.

MR. MINERVE: Yes, Your Honor. I object. That's not the lease.

THE COURT: Termination upon sale of premises. There it is. Why don't you read that to us?

THE WITNESS: Termination upon sale of premises. Notwithstanding any other provision of this lease, landlord may terminate this lease upon three months' written notice to tenant that the premises have been sold.

Q. (BY MR. SELIGER) Okay. Do you remember formulating the lease, the source for the lease? If you look on the evidence that was entered by Mr. Minerve, at the very bottom of this lease it says rocketlawyer.com. It's relevant.

A. Yes.

Q. Do you remember that?

A. Yes.

Q. That's the home page there?

A. It could be.

Q. Okay.

A. You can have a contract. Different lawyers on web site, you can . . .

Q. Okay. That's where that lease came from. It

says it on the lease here.

And let me show the jury this. When you go to rocketlawyer.com --

THE COURT: Why don't you just ask this witness a question.

Q. (BY MR. SELIGER) When you go to rocketlawyer.com, they don't allow you to write a lease, do they? They just ask you questions. It's just a bunch of questions. As you answer the questions, then the lease is formulated from those questions. Is that what you recall?

A. They have different formats for us to prepare agreements for different reasons. There is a form that you just fill out.

Q. So you don't really write the lease?

A. You can edit it. You can write it up. You can edit everything. You can edit it. You can write it up.

Q. Okay.

A. And they give you guidance as well. And you can call them and ask as well.

Q. Okay. That's a good point.

Did you edit the lease at all?

A. Obviously, yes.

Q. Okay. Did you -- what did you -- what is your testimony that you changed in the lease from

rocketlawyer.com other than just the very little words?

A.    RocketLawyer has a template --

MR. MINERVE:  Objection.  That's (indiscernible), Your Honor.

THE COURT:  I overrule.

What did you change was the question.

THE WITNESS:  I wrote the lease.

Q.    (BY MR. SELIGER)  I know you wrote it.

A.    It's a template.  They don't give you everything.  There is a template that you would need to consider.  And I considered -- whatever we agreed that day I considered should be in the lease, I put that down.

Q.    Okay.  Now, I want to ask you something very specific.  It's very general.  Let me ask you something very specific in this question.

I've read this lease and I can't find anything that you changed in this lease other than the very basic questions that they asked, which is -- the question they asked is:  Who's the tenant?  Who's the landlord?  What's the address?  When you do that, then they make the lease.  And I can't find anything in this lease that you've changed other than rocketlawyer.com format.  Even the termination of the lease.  And we -- and you have testified that we both agreed that if they

sell the property or if they build on the property, you have testified that none of that is entered into rocketlawyer.com lease. Even that termination clause which I will show you right now -- which I just showed you, it says, How many day's notice must be given to the tenant if the property is sold the lease will be terminated. And then you put that in there. And then it says, will you be allowed to terminate the lease if the property is sold or conveyed during the lease term. And it says?

MS. FLETCHER: Your Honor, we object to the narrative. We need a question.

THE COURT: Actually, there's no question. Do you want to know any information from this lady or can she go back to work?

MR. SELIGER: Yes, sir.

Q. (BY MR. SELIGER) So that's the rocketlawyer.com. And the question I've got for you, if you look at that, you remember writing it? The only variation on this very complicated agreement that we entered into, the only alteration -- if you look behind you, Lemie. The only alteration you made on termination upon civil property is the three month that I asked for. That's the only thing you changed on the entire lease.

A. I don't say this is the only thing. I have

edited everything. So it came -- this came up from the template.

Q. Can you look at the lease and point to something that you put in here --

A. It doesn't matter. This is the lease document and this is what I go by.

Q. No, it does matter, Lemie.

A. I'm not sure which part I changed, but I have used the templates to write the agreement.

Q. I --

A. I used the template to write the agreement in here.

Q. But you didn't put our agreement in here? Did you put our agreement in here?

A. What do you mean?

Q. I mean, I thought for -- I have been thinking for half a year now that you put our agreement in here but last night I discovered you didn't put our agreement in here.

A. Too bad. I think I did. And I think that's --

Q. Where did you put it?

A. You read it and you signed for it. Whatever we agreed upon was done at that time. And you had time to see if this needed to be put in, and I could have corrected it if that's what we agreed upon.

Q. Is your testimony that you did not put -- that you -- I think -- are you testifying that you didn't put our agreement in the lease and you're saying too bad? You read it and too bad?

A. I did not understand your question. Can you repeat the question?

THE COURT: Yeah. That's too many double negatives in it. The best you could, did you put the agreement into the lease?

THE WITNESS: I did put, to the best of my knowledge, what we agreed upon. To the best of my knowledge, yes.

Q. (BY MR. SELIGER) Can you point out to our agreement in this lease for the jury to hear?

THE COURT: The whole lease is your agreement. What part of it do you want her to explain?

Q. (BY MR. SELIGER) The agreement that I described is that you had a condition for leasing the property to me that you've testified, that if you sold the property or if you needed to build the property, you would need me to leave immediately.

A. Yes.

Q. And I said, I need you to agree to a three-month notification. Can you show me in the lease where that is?

A. You mean other than where it says termination of the lease.

Q. Yes, other than that.

A. That's the only piece.

Q. Is that it?

A. That's the only place.

Q. That's it?

A. Yes.

Q. Okay. Let me ask you a question.

MR. SELIGER: I need to enter some evidence. I don't need to enter stuff that's already been entered so let me get this correct here.

Do I need to hand this to the jury also?

THE COURT: What is it?

MR. SELIGER: Exhibit.

THE COURT: Not yet it's not.

MR. SELIGER: Okay.

THE COURT: Mark it. Have some witness identify it. Then offer it into evidence.

MR. SELIGER: Okay.

MR. MINERVE: Can I see a copy?

MR. SELIGER: Yes, sir. Give you this one.

Judge, do I hand you a copy?

THE COURT: No, I don't need it.

MR. SELIGER: Okay.

THE COURT: M-I-O. Mark, identification, and offer.

MR. SELIGER: Okay.

Q. (BY MR. SELIGER) Lemie, in the contract, let's go to page --

MR. MINERVE: Okay. Your Honor, I object. This --

THE COURT: He hasn't offered -- you don't get to object until he offers.

THE COURT: What's your question for this witness?

MR. SELIGER: Okay.

Q. (BY MR. SELIGER) My question -- Lemie, if you will look at the contract. Look at the second to the last page. It says "notice" on the second to the last page. And all this is is a photocopy of that lease agreement.

THE COURT: Where does it say "notice" on the next to the last page?

Q. (BY MR. SELIGER) It says "notice".

A. I don't see that.

THE COURT: We heard that, but we don't see it.

Q. (BY MR. SELIGER) Okay. It says -- you see

landlord or tenant? You see any addresses there?

A. Landlord.

Q. Okay. It's the wrong contract there.

MR. MINERVE: What page are we on?

THE WITNESS: The last page, actually.

THE COURT: We are on the signature page, she and I are, because that's what we are looking at.

Q. (BY MR. SELIGER) Okay. You're looking at it. Let me get this up for the jury here. I don't have it --

MR. MINERVE: Your Honor, we're referring to the lease. But this piece of paper here, I'd like to know what this is.

MR. SELIGER: It's a copy of -- directly taken from the lease, a photocopy taken directly from the lease.

MR. MINERVE: That is not true, Your Honor.

MR. SELIGER: Yes, sir, it is.

MR. MINERVE: He's offering -- I object. It's not. You have the lease in front of you. This is not in the lease. This is not part of the lease.

THE COURT: What page is it on?

MR. SELIGER: Let me see his lease. I could tell you.

THE COURT: May I see that lease?

MR. SELIGER: It's in my lease. He didn't photocopy it. It's in my lease that I signed. It's not in his. Mr. Minerve left it out.

THE COURT: It's not in this exhibit so we don't have it before us.

MR. SELIGER: Okay. I will have -- he's deliberately left out a page of this lease. It's not there. I'll have to dig up my original lease.

Can I have a minute to dig up my original lease? It's in there.

THE COURT: And your original lease is crossways like this one. It's landscape, not portrait.

THE COURT: Okay. Let's let -- give you time to put that thought together.

Nellie, I need you to come in and give these jurors a little orientation.

You may step down, ma'am. We'll need you back here at 1:15 so we can continue asking you questions.

THE WITNESS: Okay.

THE COURT: 1:15.

THE WITNESS: Okay. Thank you.

THE COURT: Sir?

MR. SELIGER: That's the original lease.

And it's in there.

MR. MINERVE: I need a copy of that.

THE COURT: Yeah there's a page.

Jurors, if you please go with Ms. Ojeda. She will give you a little information. And then you're on for lunch and then we'll see you back at 1:15 ready to continue.

(Jury excused for lunch.)

THE COURT: At the bottom of page 3, there is a sentence that doesn't have an ending. It is continued on the top of page 4, the information that Mr. Seliger gave me. So there we are.

MR. SELIGER: I think Mr. Bierwirth left that information out.

THE COURT: Probably so. Okay. Here is your stuff, Mr. Seliger. We'll see you at 1:15.

(Court in lunch recess.)

THE COURT: Good afternoon.

All right. We are back with the witness.

Yes, sir, pick up with you were.

MR. SELIGER: Thank you.

**CROSS-EXAMINATION (CONT.)**

Q. (BY MR. SELIGER) Lemie, I'd like to continue with this discussion that we were having about our contractual agreement which was we agreed, both parties,

that if you build on the property or if you end up selling the property that you would give me three-month notification and I would have to move and that could be at any time. It could be -- do you remember? It could be a month after I moved in.

MR. MINERVE: I object, Your Honor. That's not what she had agreed to and she did not say if the property was built on.

THE COURT: If she sold -- if you all agreed that you would give him three months' notice if you sold the property so he had three months to move and that could have happened in the first month of the tenancy.

THE WITNESS: Correct.

MR. SELIGER: Both. Selling or if they decide to build on the property. She has already testified to that.

A. Building the property.

Q. (BY MR. SELIGER) I'm sorry?

A. No. It's according to the paper, to the contract.

Q. Okay. But do you recall, after we agreed to that, that you said that you would put that in the contract?

A. No.

Q.    But you said that you would put our agreement in the contract?

A.    Yes.    I told you that I will put it in the contract, what we said.

Q.    And then I'm trying to make the point where is it in the contract.    If you put it in the contract, where is it?

A.    We didn't say word by word, you know, but we agreed to put -- we agreed to have a contract and that's what I put.

Q.    Where is this agreement in the contract, Lemie? That's what I'm asking.

A.    I don't remember what we orally discussed -- the details of what we discussed oral.

Q.    Of course.    But where is it in the contract, our agreement?    Can you find it in the contract?

THE COURT:    About three months' notice?

THE WITNESS:    The three months' notice.

THE COURT:    Is that the agreement you're asking about?

MR. SELIGER:    What we agreed -- both agreed to, that she just testified to, that we had this agreement.    Where is it in the contract?

THE COURT:    The agreement about the three months' notice is what you're asking about?

MR. SELIGER: No.

THE COURT: The entire contract is your agreement. What part of it are you asking her about?

MR. SELIGER: I'm asking her about the agreement that I would have to move at any time if they found a buyer for the contract or if they decide to build a church on the property.

THE COURT: We know that endlessly to build a church.

THE WITNESS: Under termination upon sale of premises.

MR. SELIGER: It's not in there. I agree it's not in there.

THE COURT: To build a church is not in there. Buyer is in there.

Q. (BY MR. SELIGER) Okay. Where is it?

A. Under termination upon sale of premises.

Q. Okay. So turn on the screen here. And, Lemie, you'll see that it has the question from rocketlawyer.com. And then -- that's what it looks like when they ask you that. And then this is what it looks like in the -- before you fill in the blank. Is that what you're saying represented our agreement?

A. What I'm saying is what is represented here is what I edited and presented to you.

MR. SELIGER: So I would like to enter Exhibit 1.

And I don't hand you a copy yet?

THE COURT: What is it? Have her identify it.

MR. SELIGER: It is a -- it's just a lifting of the contract -- a highlight of the termination agreement.

MR. MINERVE: Your Honor --

THE COURT: As it is?

MR. SELIGER: Exactly. It's just lifted from the photocopy.

MR. MINERVE: It's a provision that appears to mirror a provision in the contract.

MR. SELIGER: No.

MR. MINERVE: That was signed and agreed to. But it's collateral. It's something else. Why is this relevant?

THE COURT: What does it look like?

MR. SELIGER: It's straight from the contract. It's a photocopy from the contract.

THE COURT: Termination upon sale of premises. Notwithstanding any other provision of this, landlord may terminate this lease upon three months' written notice that premises has been sold.

agreed to so you're going to have to find that information someplace else.

Do you have any new questions for her? We've chased this around the block enough.

MR. SELIGER: Okay. Thank you.

All right. I want to enter this into evidence.

THE COURT: Why don't you not show it to the jury until it comes into evidence, please. Why don't you take it down off the screen until we decide if it's admissible evidence.

MR. SELIGER: Okay.

THE COURT: Thank you. Now, what question do you have for the witness?

Q. (BY MR. SELIGER) The question for the witness: Did you write a letter to the court explaining this case to the court when you declined to observe -- you were subpoenaed to come to court and you couldn't come to court or you declined to come to court and you wrote a letter of explanation of why you did not want to come to court and you explained in that letter what our agreement was in that letter?

MR. MINERVE: I'm going to object.

Q. (BY MR. SELIGER) Did you write that?

MR. MINERVE: I'm going to object, Your

Honor, because what he is asking is questioning the witness about a writing, which is collateral to the contract, that he wishes to use to interpret the contract when the contract is clear.

THE COURT: May I see it?

MR. MINERVE: Yes.

MR. SELIGER: It has direct relation to this case. Total relation to this case. She explains -- look at that star there, Judge.

THE COURT: It's just the same thing she's testified today. It's a waste of time. Let's move on to new questions.

MR. SELIGER: But you agree she testified to that?

THE COURT: She has given her testimony. The jury has heard it. What new questions do you have for her? So she can go back to work. She says she needs to go back to work.

MR. SELIGER: Okay. Exhibit 7. That's actually the text of -- photograph of text that she sent.

THE COURT: What's the question for her?

Q. (BY MR. SELIGER) Question is, Lemie --

THE COURT: And is this already in evidence?

April 2, 2014

To whom it may concern

My name is Lemlem Berhane. I work for the state of Texas under Health and Human Service Department. I am also a member and one of the board of elders in the Ethiopian Evangelical Christian Church. I just received a phone call from my church that there is a notice for me and my Pastor to appear to a court at 1:00PM tomorrow to witness a case for Frank (a tenant that rented the church property.)

I apologize sincerely however due to my work situation for the State; I am not able to get permission instantly. We are in a tight schedule to meet a deadline at my work to deliver a project. Also our Pastor, Pastor Melaku joined our church recently. He spoke with me over the phone in regards to the notice. He was not here with the church when property rented. He doesn't know the tenant. He moved to Austin to serve our church after the previous pastor retired recently. Also he doesn't speak English and the court would need to arrange an interpreter if he has to come. However as a very short notice to arrange his schedule He also wanted me to send you an apology note that he won't be able to come for tomorrow.

I signed up on the lease agreement for the church when the property located at 2108 E. Yager Ln, Austin, TX 78754 that belongs to the Ethiopian Evangelical Christian Church rented in July of 2012. The contract has not been renewed at this time. At the time we agreed that this will probably be a short time lease and we will tell him to move if we decide to build a structure or sell the property. When the one year lease was over the church needed to use the space for the community development center and I was told to contact the tenant.

I texted the tenant back in September 24, 2013 telling him that the board of elders have decided to use the property for our community development starting January 2014 therefore he needs to move by December 31, 2013. The tenant gave me reason of personal family problems and requested to extend for him until end of January. I presented to the board and the board moved the date to end of January. Extending one month has been another cost for the church as we had to change so many plans and project schedules.

Prior to having a property manager to help us vacate the tenant from our property we tried everything possible numerous occasions calling him texting him including writing a letter to him to co-operate with us to move out from the property. The tenant was notified in advance with formal letters, phone calls and text messages since September 24, 2013. He failed to move out within the given three month period and he is now exhausting our time, patience, and resource by not abiding to the contract. We need the space to deliver our call to our community.

Thank you;

Sincerely,